**GLIKAS v. TOMLINSON.**
Civil Action No. 21585.

District Court, N. D. Ohio, E. D.
Feb. 1, 1943.

---

Henry C. Lavine, of Cleveland, Ohio, for petitioner.

Roy C. Scott, Asst. U. S. Atty., of Cleveland, Ohio, for respondent.

FREED, District Judge.

The relator, an alien seaman, by application for a writ of habeas corpus, seeks to be released from the custody of the respondent who is detaining him on an order for deportation to Cardiff, Wales.

The record discloses the relator entered the United States illegally in 1938 when he deserted his ship which was flying the Greek flag. He was arrested in 1939 and ordered deported to Greece, the country of which he is a citizen and subject. In the order he was given the privilege of leaving the United States voluntarily for any country of his own choice other than contiguous territory. He reported to the immigration authorities that he had made arrangements with the master of the Kalypso Vergotti, a Greek vessel, to leave the United States for Greece. His voluntary departure was approved.

After he had boarded the Kalypso Vergotti, the master of the vessel, instead of heading for Greece, put in at Savannah,

Ga., where he took on a load of scrap metal, and then shipped for Yokohama, Japan.

The relator protested aboard ship but remained on the vessel. The Kalypso Vergotti cleared Yokohama, put in at British Columbia, where she loaded lumber, then shipped for Cardiff, Wales.

At Cardiff, the relator was taken into custody by the British immigration authorities and detained for two weeks. He was given the option of going to Greece on another vessel, or returning to the Kalypso Vergotti. He adopted the latter course, signed the ship's articles, and returned to the United Staes aboard the Kalypso Vergotti, landing at Tampa, Fla., on August 17, 1940, less than a year after his 1939 departure.

In 1942 the relator was taken into custody for deportation and the order was issued which he here contends constitutes such gross abuse of discretion on the part of the Attorney General as to render it illegal and raise a question of law.

It is argued that because the Kalypso Vergotti did not take him to Greece as was required under the arrangement made with the master of the vessel, the deportation order of 1939 was not carried out and that his re-entry into the United States in 1940 was not a new and illegal entry. He contends, therefore, that he should be deported to Greece under the 1939 order.

The relator maintains further should the court find that he did enter the United States illegally in 1940, the order that he be deported to Cardiff, Wales, the foreign port at which the relator embarked for the United States, is contrary to law because he would not be permitted an unconditional entry to Wales.

There is no doubt of the fact that the relator is an alien illegally in the United States and that he is subject to deportation.

■ As a general rule the only question for determination by the court in a hearing upon a writ of habeas corpus challenging a deportation order is whether the alien has been accorded a fair hearing by the immigration authorities. The relator herein raises no question as to the fairness of the hearing accorded him.

■ There is ample authority, however, for the right of the court in such a proceeding to inquire whether the order for deportation to a specific place is contrary to the statutory requirement so as to make it necessary for the Attorney General to amend his order to comply with the law, but not to effect the petitioner's release from custody. See: Gorcevich v. Zurbrick, 6 Cir., 48 F.2d 1054; Darabi v. Northrup, 6 Cir., 54 F.2d 70, and Wenglinsky v. Zurbrick, 282 U.S. 798, 51 S.Ct. 35, 75 L.Ed. 719.

■ Mr. Justice Brandeis, in Bilokumsky v. Tod, 263 U.S. 149, at page 158, 44 S.Ct. 54, at page 57, 68 L.Ed. 221, quoting from earlier decisions, laid down the rule: "A writ of habeas corpus is not like an action to recover damages for an unlawful arrest or commitment, but its object is to ascertain whether the prisoner can lawfully be detained in custody; and if sufficient ground for his detention by the government is shown, he is not to be discharged for defects in the original arrest or commitment."

■ An examination of the facts in the record leads the court to the finding that the relator re-entered the United States contrary to law in 1940. Unfortunate as it was for the relator, when he left the United States voluntarily, that the master of the Kalypso Vergotti deceived him in not carrying out their agreement to take him to Greece where he wanted to go, he cannot claim any right to return here because of the master's deception in taking him to Yokohama and other foreign ports. United States ex rel. Claussen v. Day, 279 U.S. 398, at 401, 49 S.Ct. 354, 73 L.Ed. 758. There is no provision in the law which insures the return of an alien to his native land or arrival in the country of his choice once he departs voluntarily.

The question for decision remains: Is the deportation order illegal as the relator contends, because Great Britain has imposed a condition upon his re-entry into Cardiff, Wales, the foreign port of embarkation, so as to require an amendment to the order?

The relator rests his contention upon the testimony of the witness, Edward J. Shaughnessy, Special Assistant to the Attorney General.

Mr. Shaughnessy testified that a serious problem had developed in the war effort of the United Nations as the result of wholesale desertions by seamen of vessels flying Greek flags both in United States and British ports. In spite of the great need for all available vessels for shipments of food and war materials, there are not enough Greek seamen to man the vessels.

In an effort to relieve this situation, the duly accredited representatives of the provisional government of Greece, resident in England, the representatives of the British government and the United States entered into an understanding to the effect that Greek seamen may be deported to England from the United States where they would be subject to the jurisdiction of a Greek maritime court.

Mr. Shaughnessy continued further that it was within the power of the Greek maritime court to order such seamen to serve on vessels of any of the United Nations, including Greece, or it could require the individual to report for duty along the coast, or, finally, it could order the seaman interned if the facts so warranted. He stated that to the best of his knowledge the relator, if deported pursuant to the order in question, upon his arrival at Cardiff, Wales, would be turned over to the Greek maritime court as provided in the international agreement.

The remaining issue in this case arises from the conflicting interpretations as to the construction of Section 156 of Title 8 of the U.S.C.A., under which authority the Attorney General ordered the relator's deportation to Cardiff, Wales.

"§ 156. Ports to which aliens to be deported; cost of deportation—

"The deportation of aliens provided for in this chapter shall, at the option of the Attorney General, be to the country whence they came or to the foreign port at which such aliens embarked for the United States; or, if such embarkation was for foreign contiguous territory, to the foreign port at which they embarked for such territory; or, if such aliens entered foreign contiguous territory from the United States and later entered the United States, or, if such aliens are held by the country from which they entered the United States not to be subjects or citizens of such country, and such country refuses to permit their reentry, or imposes any condition upon permitting reentry, then to the country of which such aliens are subjects or citizens, or to the country in which they resided prior to entering the country from which they entered the United States. If deportation proceedings are instituted at any time within five years after the entry of the alien, such deportation, including one-half of the entire cost of removal to the port of deportation, shall be at the expense of the con-

tractor, procurer, or other person by whom the alien was unlawfully induced to enter the United States, or, if that can not be done, then the cost of removal to the port of deportation shall be at the expense of the appropriation for the enforcement of the laws regulating immigration of aliens into the United States, and the deportation from such port shall be at the expense of the owner or owners of such vessels or transportation line by which such aliens respectively came, or, if that is not practicable, at the expense of the appropriation for the enforcement of the laws regulating immigration of aliens into the United States. If deportation proceedings are instituted later than five years after the entry of the alien, or, if the deportation is made by reason of causes arising subsequent to entry, the cost thereof shall be payable from said appropriation. A failure or refusal on the part of the masters, agents, owners, or consignees of vessels to comply with the order of the Attorney General to take on board, guard safely, and transport to the destination specified any alien ordered to be deported under the provisions of this chapter shall be punished by the imposition of the penalties prescribed in section 154 of this title. When in the opinion of the Attorney General the mental or physical condition of such alien is such as to require personal care and attendance, the Attorney General shall when necessary employ a suitable person for that purpose, who shall accompany such alien to his or her final destination, and the expense incident to such service shall be defrayed in the same manner as the expense of deporting the accompanied alien is defrayed. Pending the final disposal of the case of any alien so taken into custody, he may be released under a bond in the penalty of not less than $500 with security approved by the Attorney General, conditioned that such alien shall be produced when required for a hearing or hearings in regard to the charge upon which he has been taken into custody, and for deportation if he shall be found to be unlawfully within the United States."

█ It is the court's conclusion, from an analysis of the statute and the many decisions construing it, and from a canvass of the Congressional reports attending its passage that it was never intended that the Attorney General, if he failed to find a haven of refuge for a deportable alien in

the country to which he was to be deported, should provide a safe asylum for him in the United States.

■ Congress sought only to make deportation effective, and gave the Attorney General wide latitude so as to insure deportation to the place whence the alien came, or to the foreign port of embarkation. The alternatives were provided so that no loophole might be left to permit the alien to be returned to the United States by the country to which he was to be deported and to prevent his deportation thence to contiguous territory whence he might again re-enter the United States illegally.

It is here urged that the limitations outlined in this section were intended to create a right in the deportee such as would prevent the Attorney General from deporting him to any foreign port which imposed any condition whatsoever upon him after he had landed there.

The relator, in fact, maintains that in order to render deportation to a port of embarkation legal, the government must establish by affirmative proof that a passport and visa were issued to the alien permitting his unconditional entry.

The court does not believe such was the intent of Congress. To adopt such a view would lead the courts of this nation into an endless, futile examination of every type of condition that might be imposed upon the entry of any deportee before the alien leaves the United States. It would require the courts to examine into every case to determine whether there was, or might be, any condition whatsoever which, in the alien's view, would inflict some hardship upon him.

What such an interpretation would mean, in effect, is that the United States would be required to guarantee to every alien illegally in this country and subject to deportation, an unconditional and permanent asylum in the country to which he was being sent so long as it was not the land of which he was a subject or citizen.

Such an interpretation would lead the courts into impossible situations. For example, it would require the court to decide whether a Greek citizen could be deported to his port of embarkation in England, if England required him to subject himself to military service under British law or the laws of his own government resident in England. Would those be such requirements as to impose a condition upon his entry into England that would compel a court to hold the warrant of deportation to have been issued illegally? Obviously not.

■ As this court views the conditions imposed by the statute, they are such as would prevent deportation of the alien to the foreign port of embarkation because of any condition imposed upon the United States by the country in which such port is located in permitting the deportee to enter pursuant to the deportation order.

In other words, the alternatives set forth in the statute are such as to require the Attorney General to pursue those courses in the event deportation to the country whence the alien came or the foreign port of embarkation for the United States cannot be effected so as to insure that the deportation will become effective and that he will not again, once having entered the foreign country, be returned to the United States.

The relator appeals to this court to give serious consideration to what he terms a tremendous hardship imposed upon him by this order. He complains he would be deported to a country where he never has lived, whose language he does not speak and whose customs he does not understand.

He objects to being sent to Wales because he would eventually be subjected to the orders of his own provisional government in exile in England.

What he is saying in effect is: "My country has been overrun by Nazi Germany. I do not wish to be subjected to the mandates of my own government in England because it may mean extreme danger to me. Being here, the constitution of the United States guarantees me an asylum of safety".

■ This statute, as well as numerous others pertaining to immigration and deportation, were enacted by Congress for the purpose of protecting the inherent sovereign right of the United States to admit only those for residence whom it deems should be admitted, and to deport those who are in this country unlawfully. To accomplish the general purpose that undesirable aliens be excluded and deported the various sections were passed.

Congressional Records disclose numerous attempts were made, because of unusual circumstances, to amend these acts so as to afford relief. In 1917, in his veto message to Congress, President Wilson pointed

out the Act was harsh and oppressive, and stated that it would forever destroy the tradition that the United States afforded an asylum for the weak and persecuted of other nations. Congress, in spite of his plea, passed the Act substantially in its present form.

Were this court inclined to agree with the relator herein, and sympathize with his predicament, it could not grant relief in the face of the court's understanding of the law.

If the tragedy of the peoples who are the victims of war dictates a change in the policy, the remedy must be obtained from Congressional enactments and not by judicial interpretation of existing statutes.

The writ will be denied and the relator remanded to the custody of the respondent to carry out the order of deportation.